740 P.2d 693

**Richard D. BOKUM II, Plaintiff-Appellant,**

v.

**FIRST NATIONAL BANK IN ALBUQUERQUE, a National Banking Association, Defendant-Appellee.**

**No. 16574.**

Supreme Court of New Mexico.

July 29, 1987.

Rehearing Denied Aug. 20, 1987.

Melton & Puccini, Stephen P. Curtis, Albuquerque, Stephenson, Carpenter, Crout & Olmsted, Lindsay A. Lovejoy, Jr., Santa Fe, for plaintiff-appellant.

Sutin, Thayer & Browne, Jay D. Hertz, Norman Thayer, Randy Bartell, Albuquerque, for defendant-appellee.

## OPINION

SOSA, Senior Justice.

Plaintiff-appellant Richard D. Bokum II (Bokum) appeals the judgment of the trial court in favor of defendant-appellee, First National Bank in Albuquerque (FNB). Bokum's amended complaint, filed on April 9, 1985, contained seven counts: (1) "Usury," in which Bokum alleged that a series of FNB loans were made at a higher rate of interest than allowed by law, and in which he asked the court for a forfeiture of $2,161,871.80 in usurious interest, plus

$165,802.52 "affirmative recovery" as penalty for interest paid. The latter plea was based on a remedy for twice the amount of allegedly usurious interest paid, as provided by the National Bank Act, 12 U.S.C. Sections 85 and 86; (2) "Noncompliance with Lending Disclosure Laws," in which Bokum alleged that FNB failed to comply with the disclosure requirements of NMSA 1978, Section 56–8–11.2 (Cum.Supp.1984), and in which he asked the court to determine the extent of his liability as to certain promissory notes executed by him and tainted by FNB's alleged noncompliance with the above statute; (3) "Conversion," in which Bokum alleged that FNB converted a mortgage document securing a loan on his residence in Miami, Florida (a count which Bokum abandoned on appeal); (4), (5), and (6) "Fraud and Deceit" alleged to have been perpetrated against him by FNB in relation to, respectively, two loan transactions and an accord and satisfaction agreement; and (7) "Injunctive Relief Against Sale of Stock Allegedly Pledged as Security" for three loans made to Bokum in 1982 (referred to herein as the 1982 notes).

FNB filed a counterclaim in which it sought: (1) judgment on two of the 1982 notes, executed by Bokum individually and as president of his solely owned corporation, Quinta Land and Cattle Co., Inc. (Quinta), totaling $724,590.70, plus interest at 16%, costs, and attorneys' fees; (2) judgment on the third note, executed in the same fashion, in the amount of $82,000.00 at a floating interest rate, plus costs and attorneys' fees; (3) a declaration by the court that FNB could sell disputed collateral, some 317,000 shares of stock in Bokum Resources Corporation (BRC), pursuant to the provisions of 1981 N.M.Laws, ch. 10, Section 1, virtually identical to the present NMSA 1978, Section 55–9–504 (Cum.Supp.1986); and (4) judgment in FNB's favor as to an accord and satisfaction agreement entered into by the parties on February 6, 1981 in which Bokum is alleged by FNB to have settled all claims as to any past usury, and otherwise to have started anew in his relationship with FNB, cancelling all past indebtedness and executing the 1982 notes as new obligations.

Trial without a jury began on September 30, 1985, and concluded on October 9, 1985. The court made eighty-nine findings of fact and fifty-five conclusions of law, and then rendered judgment for FNB on the three 1982 notes, together with attorneys' fees in the amount of $135,837.00 and costs in the amount of $12,509.00. The court dismissed the complaint with prejudice, and declared that FNB was entitled to sell the disputed collateral.

For the reasons set forth below, we affirm the judgment of the trial court in its entirety.

FACTS

In 1972 Bokum began borrowing money from FNB and executing promissory notes evidencing the debts so created. On or about April 25, 1974, Bokum executed Note No. 442, executed by him individually and as president of Quinta, renewing what Bokum calls "a secured line of credit" in the amount of $2,500,000.00 at FNB's prime rate plus 1%. Beginning with Note No. 442, we can trace the parties' relationship through thirteen more loans in the lineage of notes descending from No. 442, reflected in thirteen additional promissory notes, each of which renewed in whole or in part amounts loaned to Bokum beginning with Note No. 442.

Bokum attached copies of these notes to his complaint. Several of these copies show that some of the notes in this series were signed by Bokum individually, and others by Bokum individually and as president of Quinta. Both in his complaint and in his brief on appeal, Bokum alleges that the irregularity in execution of the notes demonstrates that some of the notes were strictly personal. Further, he contends that FNB deceitfully induced him to execute the notes signed by him as president of Quinta as part of FNB's scheme to avoid possible later allegation of usury, because NMSA 1978, Section 56–8–9 (Repl.Pamp. 1986) exempts corporations from the penalties associated with usurious interest rates.

In his complaint Bokum alleged that nine of the above notes were usurious on their face because the rate of interest charged

was more than 10%—the amount legally allowable under the law in effect at the time the loans were made (1957 N.M.Laws, ch. 209, Section 2, substantially revised in 1980 by the law now found in NMSA 1978, Sections 56–8–11.1 through 11.4 (Repl. Pamp.1986)). As to the remaining five notes in this series, Bokum alleged that, although the rate of interest was less than 10%, these notes were tainted by usury in that previous usurious interest flowed into these notes.

At some point in 1976 (the vagueness as to specific dates arises from Bokum's complaint), a new generation of loans and notes was created, which by August 1977 encompassed debts totalling $1,300,000.00. Accordingly, on October 4, 1977 Bokum's debts under this new line of credit were consolidated and renewed by a loan reflected in Note No. 51 in the amount of $1,300,000.00 at FNB's prime interest rate plus 1% (which in his complaint Bokum alleged was usurious). On June 19, 1979, Note No. 51 was renewed by Note No. 94, this time co-signed by Bokum's wife, in the amount of $1,750,000.00 at prime rate plus 1½%. On the same day Bokum, his attorney and certain others co-signed Note No. 74672–19 (referred to by the trial court as "Note 19") which was given in payment of accrued interest on Notes 51 and 94. Note 19 was then renewed in Note 27, likewise co-signed by Bokum and his associates referred to above.

Up until this point FNB is in agreement with Bokum as to the facts surrounding the loans as set forth in Bokum's complaint (tracked above), except as to Bokum's allegations that the interest rates were usurious and that FNB deceived Bokum into co-signing some notes as president of Quinta. We now reach the factual dispute which forms the gravamen of Bokum's cause of action. On February 6, 1981 Bokum executed two notes, No. 752 in the amount of $394,360.70 and No. 108 in the amount of $830,000.00. Bokum contends that these notes were renewals of the two lines of credit referred to above, and thus that they continued FNB's usurious conduct into the present.

FNB, on the other hand, contends that all debts reflected in the two lines of credit, starting with Notes 442 and 51, respectively, were eliminated in an accord and satisfaction agreement executed by FNB, Bokum individually, Bokum as president of Quinta, and Mrs. Bokum, and dated February 6, 1981. Thus FNB contends that Notes 752 and 108 were entirely new notes, reflecting entirely new debts. On February 6, 1982, Notes 752 and 108 were renewed (both parties agree) by Notes 753 and 109, in the sums of $394,360.70 and $330,230.00, respectively. On June 9, 1982, Bokum executed Note No. 5052 in the amount of $82,000.00, which Bokum alleges was a renewal of past indebtedness, and which FNB contends was a new note.

Bokum admits that he executed the accord and satisfaction agreement, but he contends that he did so without reading it, because he was under the time pressure of having to consider the agreement immediately before attending the closing on the sale of his home in Miami, Florida, and because he received fraudulent assurances from FNB's agents that the agreement embodied an earlier and different understanding.[1] Bokum makes this assertion in spite of his attorney's admission that he advised Bokum by telephone not to sign the agreement.

The uncontested terms of the accord and satisfaction agreement are as follows: (1) Bokum, Quinta, and Mrs. Bokum stipulated that as of February 6, 1981, they jointly owed FNB for all indebtedness going back "over the many years of their banking relationship," $2,650,000.00, comprising the indebtedness reflected in Note No. 94 for $1,750,000.00, in Note No. 744 for $500,000.00 and in Note No. 19 for $400,000.00. FNB agreed to forego the full amount of interest owed to it, and Bokum, et al. stipulated that none of the previous loans exact-

---

1. We need not dwell on the terms of this understanding, as alleged in Bokum's complaint (Counts V and VI), because as we will discuss below, we find that the 1981 accord and satis-faction agreement disposed of any such understanding. As to Count IV of Bokum's complaint, that count was abandoned on appeal.

ed usurious rates of interest (as alleged shortly before the date of the accord and satisfaction agreement, when Bokum's attorney started to review Bokum's relationship with FNB).

The parties also stipulated that by the accord and satisfaction agreement they "fully and forever settle and compromise their relationships in the past." On the strength of this agreement FNB contends that the subsequent 1981 Notes (Nos. 752 and 108) were new notes, renewed by the first two 1982 Notes (753 and 109), and that the third 1982 note (5052) was itself an original note. Bokum disagrees, insisting that the three 1982 notes were reproductions of the entire usurious relationship extending back to Note No. 442 executed in 1974.

### I. Credibility of Witnesses

 On appeal Bokum asks us to set aside many of the trial court's findings of fact on the grounds that FNB's witnesses contradicted themselves or otherwise deviated from the truth. He asserts that the issue here is not that of the trial court's weighing substantial evidence, but of the complete incompetence and unreliability of the testimony. We disagree. Close study of the 1210–page transcript leads us to conclude that FNB's witnesses were not untruthful. Instead, we find that several of FNB's witnesses simply could not remember detailed transactions occurring over four years before trial, and for this they are not to be faulted, since it was Bokum himself who was dilatory in filing his amended complaint—a complaint which covered events as much as eleven years old, and which was filed four years after the date of the disputed accord and satisfaction agreement. We hold, then, that this *is* a substantial evidence issue, and we therefore conclude that "any evidence unfavorable to the trial court's finding will be disregarded and only favorable evidence considered." *Tafoya v. Casa Vieja, Inc.,* 104 N.M. 775, 778, 727 P.2d 83, 86 (Ct.App. 1986). Our function on appeal is not to weigh conflicting evidence, but to view the evidence in the light most favorable to the prevailing party. *Duke City Lumber Co.*

*v. Terrel,* 88 N.M. 299, 540 P.2d 229 (1975). Accordingly, we accept as accurate the trial court's finding of facts, many of which we do not need in order to reach our decision herein, but which demonstrate nonetheless the trial court's mastery of the issues here involved.

### II. Validity of the Accord and Satisfaction Agreement

In order to agree with Bokum that—without understanding what he was doing—he was induced by FNB into signing an agreement which reordered his entire financial existence, we must leap over an unbridgeable chasm separating fact from fiction. The record supports the trial court's findings of facts numbers eleven through fifteen that Bokum "is a competent and experienced businessman who has had extensive dealings with banks across the country * * * [That he] has founded or been closely involved with several corporations over the years * * * [That he] has dealt with high officials in both the United States and foreign governments and counts among his friends many famous government, industry, banking and finance figures * * * [That he] retained capable lawyers and accountants to represent him in his many business dealings * * * [And that he] was represented by competent counsel throughout the time during which the events in question took place."

 In short, Bokum either knew or should have known what he was effecting in signing the accord and satisfaction agreement, but if he signed the agreement without reading it, or without being accurately apprised of what he was signing (contentions which lay hidden for four years, until the filing of his complaint), then he is nonetheless responsible for the legal effect of the document. (*See Smith v. Price's Creameries,* 98 N.M. 541, 544, 650 P.2d 825, 828 (1982), in a very similar factual setting with respect to the issue of detrimental reliance on purportedly fraudulent inducement, where we stated:

At the time of the formulation of the agreement between the parties, Mr.

Smith was approximately 28 years of age, had a working knowledge of the duties of a route man for a dairy products distributor, and had previous experience working with a finance company, and additionally he had worked both as an insurance salesman and as a police officer. Mr. Smith also had three and one-half years of college education. Under the circumstances no material disputed factual issue has been shown to exist concerning lack of adequate opportunity to fairly review the contract, inability to understand the provisions of the document, or lack of opportunity to seek independent professional advice regarding the terms and provisions of the agreement.

The Smiths although conceding that they were aware of both the existence and language of the termination clause, argue that they were assured prior to the execution of the agreement that the contract would continue to remain in effect as long as they performed satisfactorily under the distributorship. Even assuming the truth of this assertion, in the face of the clear wording of the rights of the parties under the termination clause, the oral statement of Price's made prior to execution of the agreement cannot be deemed to constitute fraud or misrepresentation.)

Here the trial court concluded that the accord and satisfaction agreement was duly executed by Bokum, et al. without fraud, and that the allegations within his complaint "fall within the scope" of the agreement. Hence, the notes executed on February 6, 1981 constitute entirely new transactions, and the 1982 renewal notes were properly held by the trial court to be due and owing on maturity. Therefore, the effect of the 1981 accord and satisfaction agreement with respect to the claim of pre-existing usury was to purge any such usury from the parties' relationship, and, as the agreement itself stated, "to lay the past to rest forever, to adjust and compro-

mise and rearrange their affairs, and to start out again with a clean slate."

■ As the courts of this country have stated early and often when considering the issue of usury under the National Bank Act, "[i]f the debt was infected with usury, the creditor could purge it of the usury in a settlement with his debtor." *First Nat'l Bank v. Davis*, 135 Ga. 687, 693, 70 S.E. 246, 249 (1911). The cases of *Credit Alliance Corp. v. Timmco Equip., Inc.*, 457 So.2d 1102 (Fla.App.4 Dist.1984), and *Clinton G. Bush Co. v. Franklin Nat'l Bank*, 20 A.D.2d 904, 248 N.Y.S.2d 990 (1964) likewise stand for the proposition which we advance here—namely, that a debtor, by entering into a settlement agreement with his creditor which purges asserted usurious conduct, may waive or be estopped from asserting the defense of usury, when there is an abandonment of the usurious note and the execution of a new note or notes at lawful interest.

### III. Issues Relating to the New Mexico Usury Act, NMSA 1978, Sections 56–8–11.1–11.4 (Repl.Pamp.1986)

■ In addition to asserting a cause of action under the National Bank Act, which, incidentally, we find that the trial court correctly disallowed because it was not timely filed "within two years from the time the usurious transaction occurred," 12 U.S.C. Section 86,[2] Bokum also asserts that he has a cause of action under the New Mexico Usury Act as it existed at the time of the facts set forth above—namely, under 1957 N.M.Laws ch. 209, Section 2, which established the maximum allowable interest rate of 10% in the situation here, and under Section 4, which established the right of "forfeiture of the entire amount of such interest," and which further allowed a civil action to recover twice the amount of interest paid.

■ The problem for Bokum with respect to this issue is that the statute on which he relies was repealed by the Usury

---

**2.** Further, by the decision in *Haseltine v. Central Bank of Springfield*, 183 U.S. 132, 22 S.Ct. 50, 46 L.Ed. 118 (1901), Bokum is not entitled to a *forfeiture* of alleged usurious interest already

paid. The only remedy under the National Bank Act in such a situation is to bring an action within two years for twice the amount of interest paid.

Act cited in this headnote. In the leading case on this issue the United States Supreme Court held that when a usury statute is repealed, any cause of action granted by it dies with the repeal. Further, such a repeal operates retrospectively, so as to cut off the defense of usury for the future, even in actions for contracts previously made. *Ewell v. Daggs*, 108 U.S. 143, 2 S.Ct. 408, 27 L.Ed. 682 (1883). *See American Sav. Life Ins. Co. v. Financial Affairs Management Co.*, 20 Ariz.App. 479, 513 P.2d 1362 (1973). We follow the Supreme Court's and the Arizona court's reasoning by holding that the statute on which Bokum relies was repealed at the time he filed his complaint, and that he therefore had no cause of action under previous New Mexico law.

Did Bokum, then, have a cause of action under *present* usury law? He contends he did, but once again he is faced with an insuperable obstacle. Under present law, NMSA 1978, Section 56–8–9(B) (Repl.Pamp.1986), the maximum rates of interest allowable do not apply to a transaction in which a corporation is a debtor, regardless of the fact that an individual is codebtor. Here the trial court explicitly found that Notes 752, 108 and 5052 "were made by Quinta" (Finding of Fact No. 42). Hence whatever rate of interest is asserted by Bokum to be usurious is exempted by Section 56–8–9(B). Thus, whether he relies on New Mexico Law or on the National Bank Act, which embodies the New Mexico corporate exemption (*see McNellis v. Merchants Nat'l Bank & Trust Co.*, 390 F.2d 239 (2nd Cir.1968)); *Federal Deposit Ins. Corp. v. Julius Richman, Inc.*, 666 F.2d 780 (2nd Cir.1981)), Bokum's claim is barred.

Thus, since the corporate exemption applies to this case, the maximum rate of interest which FNB was allowed to make in this circumstance is governed by Section 56–8–11.1, which specifies that "The maximum rate of interest authorized by law shall be that rate agreed to in writing by the parties," unless the creditor fails to comply with the disclosure requirement of Section 56–8–11.2. But the latter section affords Bokum no relief either, since subsection (C) of Section 56–8–11.2 provides that the disclosure requirement "shall not be required for loans made in excess of fifty thousand dollars ($50,000) when such loans are made for business or agricultural purposes."

We thus affirm the trial court's ruling in its entirety as to the issues raised above.

SCARBOROUGH, C.J., and STOWERS, JJ., concur.